PHILLIPS PETROLEUM COMPANY,
Plaintiff,

v.

UNITED STATES STEEL CORP.,
Defendant.

Civ. A. No. 83–143.

United States District Court,
D. Delaware.

June 15, 1983.

C. Waggaman Berl, Jr., Wilmington, Del., of counsel; Harry J. Roper, Sidney Neuman, Kenneth R. Adamo, George S. Bosy, and Nicholas A. Poulos, Neuman, Williams, Anderson & Olson, Chicago, Ill., for plaintiff.

Paul E. Crawford, and Henry E. Gallagher, Jr., Connolly, Bove, Lodge & Hutz, Wilmington, Del., of counsel; James B. Gambrell, Charles M. Cox, and Wayne E. Webb, Pravel, Gambrell, Hewitt, Kirk & Kimball, Houston, Tex., for defendant.

MURRAY M. SCHWARTZ, District Judge.

On March 15, 1983, after protracted litigation, the Patent and Trademark Office issued United States Patent No. 4,376,851 ("'851") to Phillips Petroleum Company ("Phillips"). On the same day, Phillips filed the present action against United States Steel Corporation ("U.S. Steel") for infringement of the patent. By letter dated March 15, 1983, Phillips offered several companies, including U.S. Steel, non-exclusive licenses relating to polypropylene at a specified royalty rate. The offer was to remain open for a period of approximately 90 days, until June 15, 1983.

On June 2, 1983, defendant U.S. Steel moved for a preliminary injunction, seeking to enjoin Phillips from withdrawing the March 15, 1983 license offer during the pendency of the present action and until the expiration of sixty days following entry of judgment. The parties briefed the issue, and a hearing was held on June 14, 1983. Determination of the motion involves a threshold question of subject matter jurisdiction, and, thereafter, the merits of the appropriateness of preliminary injunctive relief. A review of the relevant background facts, as currently developed in the record, is warranted.

*Facts*

In the 1960's, Montedison S.p.A. ("Montedison"), formerly Montecatini Edison S.p.A., initiated infringement litigation in this Court against Phillips and other major producers of polypropylene on a Montedison polypropylene patent. All of the Montedison lawsuits were eventually settled in 1974 and 1975.

The 1974 Montedison/Phillips Settlement Agreement ("Settlement Agreement") includes, *inter alia,* the following provision:

*Article 5—Other Obligations of Licensee*

5.1 If PHILLIPS shall hereafter be granted any United States patent having an effective filing date prior to December 1, 1963, covering Royalty-bearing Products, PHILLIPS agrees to offer to MONTEDISON and all other licensees or immunity holders of MONTEDISON under the Designated Patents a non-exclusive license in sole consideration of a royalty not exceeding seventeen and one-half hundredths cent (0.175 cent) per pound of Product covered by such patent.

(Doc. 11A, Exh. E ¶ 5.1). When the '851 patent issued to Phillips in March 1983, Phillips offered licenses pursuant to this Settlement Agreement at the 0.175 cent rate, a royalty it apparently considered to be extremely favorable from a licensee perspective. Phillips' March 15, 1983 letter to U.S. Steel conditioned the offer of the License Agreement ("license") as follows:

... if this offer is not accepted by you within the time specified, we will consider our obligation under the Montedison agreement to have been fulfilled and will not again offer you a license under the newly issued patent on the same terms.

If, prior to the close of business on June 15, 1983, we have not received a copy of the accompanying License Agreement duly executed on behalf of your company, this offer will automatically expire.

(Doc. 11A, Exh. D).

On or about April 18, 1983, U.S. Steel's counsel requested that Phillips agree to an

extension of the June 15, 1983 deadline for acceptance until at least December, 1983. The additional time was requested to enable U.S. Steel to evaluate the Phillips patent and assess the advisability of accepting or rejecting the offered license agreement. Phillips refused to extend the deadline. (Doc. 9).

On June 2, 1983, U.S. Steel filed its answer denying that the Phillips patent was valid, enforceable or infringed. It also counterclaimed, seeking a declaratory judgment (1) that the '851 patent is invalid, unenforceable and not infringed by U.S. Steel; (2) that Phillips has breached its 1974 contract with Montedison by burdening the offer of a license to U.S. Steel with terms and conditions in contravention of the Settlement Agreement; and (3) construing the rights of U.S. Steel as a third party beneficiary to the Settlement Agreement. (Doc. 7). On the same day, defendant filed the instant motion for preliminary injunction. (Doc. 8).

Phillips offered identical licenses to eleven U.S. manufacturers of polypropylene, including defendant U.S. Steel. Phillips left the offers open for a ninety-day period to allow the proposed licensees to evaluate their positions. During the ninety-day period, Phillips made available to interested offerees certain portions of the file of the underlying proceedings involving this patent. Defendant availed itself of this opportunity by spending two days in Chicago to study the file.

No one disputes that the polypropylene patent at issue has a unique history in terms of size and complexity. For some of the flavor of the litigation preceding issuance of the patent, see *Standard Oil Co. v. Montedison, S.p.A.*, 494 F.Supp. 370 (D.Del.1980), aff'd, 664 F.2d 356 (3d Cir. 1981), cert. denied, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982). Following the

proceedings in the federal courts, the patent application was in the Patent and Trademark Office for eighteen months before the patent issued. U.S. Steel participated in these Patent Office proceedings and filed a Protest against issuance of the patent on April 19, 1982. The protest was grounded on double patenting. (Doc. 13A, Exh. 3).

All of the proposed licensees, except U.S. Steel and Exxon Corporation, have negotiated various terms and conditions with Phillips, and as of June 10, 1983, three have signed licenses at the 0.175 cent rate.[1] (Williams Affidavit, ¶¶ 3–11, Doc. 13A, Exh. 2). Although the Settlement Agreement does not expressly provide that Phillips can condition acceptance of its offer within a specific (90-day) time period, U.S. Steel and Hercules, Inc. ("Hercules")[2] are the only proposed licensees to complain to Phillips that the three-month period is an unreasonable time within which to complete their study, and the only ones to seek injunctive relief. (Williams Affidavit, ¶¶ 12, 16, 20–21, Doc. 13A, Exh. 2).

*Subject Matter Jurisdiction*

Defendant argues (Doc. 11, pp. 12–15), and the plaintiff does not contest, that jurisdiction over the counterclaim that forms the basis of the motion for the preliminary injunction is proper in this case. The defendant takes the position that its counterclaims for breach of the Settlement Agreement between Montedison and Phillips, Counts II and III of the counterclaim (Doc. 7), are compulsory and therefore within the ancillary jurisdiction of the Court.[3]

"If a counterclaim is compulsory, the federal court will have ancillary jurisdiction over it even though ordinarily it would be a matter for a state court." *Baker v. Gold Seal Liquors,* 417 U.S. 467, 469 n. 1, 94 S.Ct. 2504, 2506 n. 1, 41 L.Ed.2d 243 (1974) (citation omitted); *Nationwide Mutual Fire In-*

---

1. During oral argument on June 14, 1983, counsel for Phillips represented to the Court that as of that date more than three proposed licensees have signed at the 0.175 cent rate.

2. Hercules, a defendant in C.A. No. 83–148, has informally agreed with plaintiff that the deci-

sion in this matter shall be outcome determinative of its similar motion (Doc. 6) filed in its case.

3. Jurisdiction over the plaintiff's claim is present pursuant to 28 U.S.C. § 1338.

*surance Co. v. T & D Cottage Auto Parts & Service Inc.,* 705 F.2d 685 at 687 (3d Cir. 1983); *Revere Copper & Brass, Inc. v. Aetna Casualty & Surety Co.,* 426 F.2d 709, 715 (5th Cir.1970).

■ Pursuant to Fed.R.Civ.P. 13(a), a counterclaim is compulsory "if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." As the Third Circuit Court of Appeals explained in the seminal case, *Great Lakes Rubber Corp. v. Herbert Cooper Co.,* 286 F.2d 631, 634 (3d Cir.1961):

> We have indicated that a counterclaim is compulsory if it bears a 'logical relationship' to an opposing party's claim.... The phrase 'logical relationship' is given meaning by the purpose of the rule which it was designed to implement. Thus, a counterclaim is logically related to the opposing party's claim where separate trials on each of their respective claims would involve a substantial duplication of effort and time by the parties and the courts. Where multiple claims involve many of the same factual issues, or the same factual and legal issues, or where they are offshoots of the same basic controversy between the parties, fairness and considerations of convenience and of economy require that the counterclaimant be permitted to maintain his cause of action. [Citations omitted.]

*See Baker v. Gold Seal Liquors, Inc.,* 417 U.S. at 469 n. 1, 94 S.Ct. at 2506 n. 1.

Similarly, in *Revere Copper & Brass, Inc. v. Aetna Casualty & Surety Co.,* 426 F.2d at 715, the Fifth Circuit Court of Appeals stated:

> [I]t appears that a claim has a logical relationship to the original claim if it *arises* out of the same aggregate of operative facts as the original claim in two senses: (1) that the same aggregate of operative facts serves as the basis of both claims; or (2) that the aggregate core of facts upon which the original claim rests activates additional legal rights in a party

defendant that would otherwise remain dormant.

■ In the present case, U.S. Steel's counterclaims for breach of contract and for a declaratory judgment all arise from U.S. Steel's alleged status as a third-party beneficiary of the Settlement Agreement. No one disputes the interrelationship of the Settlement Agreement and the '851 patent.

Applying the analysis set forth in *Great Lakes Rubber Corp. v. Herbert Cooper Co.,* 286 F.2d at 634, the counterclaims of U.S. Steel are "offshoots of the same basic controversy between the parties." The interrelationship of the plaintiff's claims and the defendant's counterclaims indicates that the defendant's counterclaims are compulsory under the meaning of Rule 13(a) and, therefore, within the Court's ancillary jurisdiction.

*The Relief Sought and the Applicable Standard*

The defendant has moved to preliminarily enjoin the plaintiff from withdrawing or cancelling its offer of a license to U.S. Steel under the '851 patent until 60 days after the entry of a judgment construing the validity and infringement of the patent and, if necessary, construing the rights of the parties under the Settlement Agreement. In addition, defendant seeks to enjoin the plaintiff from including in the license an express clause that non-payment of royalties could be treated by Phillips as a breach of the license justifying its termination. The defendant would also accept an injunction whereby it would sign the license and pay royalties provided Phillips would be precluded from asserting that U.S. Steel could not "challenge the validity and application of the PHILLIPS' patent to U.S.S.'s products," and recoup royalties with interest if it ultimately prevailed. (Doc. 11, pp. 3, 43).

■ The parties do not dispute the relevant standard governing the grant of a preliminary injunction. The standard is well settled:

We have repeatedly held that for the district court to grant a preliminary injunction:

> the moving party must generally show (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. Moreover, while the burden rests on the moving party to make these two requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."

*In Re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir.1982) (quoting *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir.1975) (citations omitted)); *see Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc.*, 630 F.2d 120, 136 (3d Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980); *Coca-Cola Bottling Co. v. Coca-Cola Co.*, 563 F.Supp. 1122, 1130 (D.Del.1983).[4]

In applying this standard, the Court must balance the degree of proof of irreparable harm and probability of success against the other two interests. *Constructors Assoc. of Western Pennsylvania v. Kreps*, 573 F.2d 811, 815 (3d Cir.1978).

> Thus, for example, in a situation where factors of irreparable harm, interests of third parties and public considerations strongly favor the moving party, an injunction might be appropriate 'even though plaintiffs did not demonstrate as strong a likelihood of ultimate success as would generally be required.' In contrast, where the threatened irreparable injury is limited or is balanced to a substantial degree by countervailing injuries which would result to third parties, or to the public interest from the issuance of an injunction, 'greater significance must be placed upon the likelihood that the party will ultimately succeed on the merits of the litigation.'

*Id.* (quoting *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 923–24 (3d Cir.1974)). Applying this standard to the instant case, the defendant's motion for a preliminary injunction will be denied.

### Probability of Success on the Merits

Under the applicable standard discussed above, U.S. Steel as the moving party has the burden of showing a reasonable probability of success in the litigation on its contract counterclaims. U.S. Steel asserts that in the March 15, 1983 licensing offer Phillips breached its contract by including terms and conditions in contravention of the Settlement Agreement. Phillips, on the other hand, asserts that it fully complied with any obligation under paragraph 5.1 of the Settlement Agreement, even though it claims not to be bound by this paragraph. The relevant issues are whether: a) the most favored licensee provision of paragraph 6 relieves Phillips of its obligations under paragraph 5.1; b) U.S. Steel has third-party beneficiary status to assert rights under paragraph 5.1; c) Phillips is precluded from including additional terms and conditions in the license offer; d) the

---

4. In its reply brief, defendant U.S. Steel asserts that this Court should follow the precedent of the Court of Appeals for the Federal Circuit ("CAFC") since pursuant to 28 U.S.C. § 1295(a)(1) an appeal of this action will be before the CAFC and not the Third Circuit Court of Appeals. (Doc. 18 p. 4). Since the CAFC has held that only the decisions of the Court of Customs and Patent Appeals and the United States Court of Claims shall be binding upon it as precedent, *see South Corp. v. United States*, 690 F.2d 1368, 1370–71 (C.A.F.C.1982), defendant argues that this Court should not follow Third Circuit Court of Appeal cases that conflict with precedential cases binding the CAFC. The United States Court of Customs and Patent Appeals, in *S.J. Stile Assoc. Ltd. v. Snyder*, 646 F.2d 522, 525 (Cust. & Pat.App. 1981), recently applied the following substantially similar four part test:

> [The] requisites for a preliminary injunction [are]: (1) a threat of immediate irreparable harm; (2) that the public interest would be better served by issuing than by denying the injunction; (3) a likelihood of success on the merits; and (4) that the balance of hardship on the parties favored appellant.

Under either standard, the defendant has failed to satisfy the requisites for a preliminary injunction.

ninety-day offer period is reasonable; and, e) the termination clause is reasonable. These will be considered seriatim.

### a. The "Most Favored Licensee" Provision

Phillips argues that paragraph 5.1 of the Settlement Agreement is unenforceable by U.S. Steel because Phillips is relieved of any obligations under paragraph 5.1 by virtue of the "Most Favored Licensee" provision of paragraph 6. This paragraph reads as follows:

> 6. If a license, immunity from suit, nonassertion or other rights under the Designated Patents shall hereafter be granted by MONTEDISON on terms in whole or in part move favorable than those provided herein, MONTEDISON will promptly notify PHILLIPS of the grant of such license, immunity from suit, nonassertion or other rights and PHILLIPS shall be entitled to the benefit of such more favorable terms in respect to any production of Royalty-bearing Products subsequent to such grant, but only for so long as, and subject to the same conditions under which such more favorable terms shall be available to said party. This Article 6 shall not apply to any license MONTEDISON is required to grant to or for the benefit of the United States Government.

(Doc. 11, Exh. E). This clause entitles Phillips to any more favorable terms granted by Montedison in any other license under the Designated Patents. Phillips notes that in 1975, Montedison granted licenses to others which did not contain any provisions such as paragraph 5.1 in the Settlement Agreement. Therefore, Phillips asserts, these subsequent licenses were more favorable and Phillips is entitled to the more favorable terms. While Phillips never renegotiated its Agreement to include these more favorable terms, Phillips asserts they automatically applied to it without further action on its part.

While the issue is intriguing and potentially dispositive, the short time period devoted to briefing and the even shorter time for decision together with the failure of the plaintiff to cite any authority holding that an omitted provision should be considered more favorable dictates against any preliminary decision. In light of the Court's decision to deny the defendant's motion, there is no need for the Court to decide the issue at this time.

### b. Third-Party Beneficiary Status of U.S. Steel

Phillips also contends that U.S. Steel has no "standing" to assert any claim under the Settlement Agreement because it has failed to establish that it falls within the class of third party beneficiaries identified in paragraph 5.1, i.e., "licensee or immunity holder" under Montedison's Designated Patents. The issue is in reality not one of standing; rather, it is a factual inquiry as to whether U.S. Steel, through its purchase of Novamont Corporation U.S.A. ("Novamont") stock and subsequent merger of Novamont into itself, became a third party beneficiary to the Settlement Agreement.

It is uncontested that Novamont was, as of 1974 when the Settlement Agreement was executed, a wholly owned subsidiary of Montedison. It is also uncontested that it was a licensee under the Designated Patents pursuant to agreements between Montedison and Novamont dated August 11, 1967 and January 24, 1968 (Doc. 11A, Exh. F), and an immunity holder under the Designated Patents. (Doc. 11A, Exh. H). The issue is whether U.S. Steel succeeded to Novamont's interest. U.S. Steel purchased the outstanding stock of Novamont from Montedison on June 15, 1979. A stock purchase standing alone would seemingly not confer any direct contractual status of licensee or immunity holder upon U.S. Steel. However, in late 1981, Novamont's entire business and assets, including its patent-related assets, were absorbed by U.S. Steel pursuant to a statutory merger.[5] (Krayer

---

**5.** Both U.S. Steel and Novamont are Delaware corporations. (Doc. 11A, Exh. G). Pursuant to

8 Del.C. § 259, the surviving corporation of a

**1100**

Affidavit, Doc. 14, ¶¶ 1, 9). For present purposes, the Court finds that U.S. Steel has made a sufficient showing of third-party beneficiary status.

### c. Propriety of Inclusion of Additional Terms

■ In attempting to clarify the intent of the parties to the Settlement Agreement, U.S. Steel presents the affidavit of Franco Carloni, the Chief of Montedison's Licensing and Engineering Department as of the time the Agreement was negotiated, who was involved in the negotiation process. (Doc. 11A, Exh. J; Doc. 12). Carloni indicates that Montedison intended to provide its licensee and immunity holders a continuing right to have a license under any patent which might issue to Phillips covering polypropylene products. He further states that there was no intent or understanding by Montedison that Phillips would have the right to condition the offer to acceptance within a specific time period or to incorporate other terms and conditions not expressed in paragraph 5.1. *Id.* at ¶¶ 8–10. U.S. Steel offers this affidavit to reinforce its argument that paragraph 5.1 means exactly what it says, i.e., that Phillips is to offer the license in *sole consideration* of the specified royalty.[6]

Phillips, however, strongly disagrees with a reading of paragraph 5.1 which would mandate that Phillips' offer be forever irrevocable. On its behalf, Phillips presents the affidavit of Donald J. Quigg, the former General Patent Counsel for Phillips and its representative in the Settlement Agreement negotiations. (Doc. 13A, Exh. 1). Quigg asserts that the purpose of paragraph 5.1 of the Settlement Agreement was "to provide a vehicle by which all litigation over 'polypropylene' could be settled." *Id.,* ¶¶ 4, 6. He further states that it was not the parties' intent that the offer remain open indefinitely. *Id.,* ¶ 6. Quigg also asserts that the parties intended to set forth only the basic royalty rate provision of the license, leaving remaining terms open for

subsequent negotiation by the parties. *Id.,* ¶¶ 5–7. As noted *infra, no* such meaningful negotiation has taken place between U.S. Steel and Phillips.

Ignoring concerns about the admissibility of the statements, it is obvious the Court is met with contradictory assertions about the intent of the parties with respect to paragraph 5.1 and what could be in a prospective license. It is axiomatic that an evidentiary hearing is required to decide credibility issues:

> The seminal case in this area is *Sims v. Greene,* 161 F.2d 87 (3d Cir.1947), where the court held that a hearing was required prior to the issuance of a preliminary injunction when the pleadings and affidavits were conflicting:
>
>> Such conflicts must be resolved by oral testimony since only by hearing the witnesses and observing their demeanor on the stand can the trier of fact determine the veracity of the allegations made by the respective parties. If witnesses are not heard the trial court will be left in the position of preferring one piece of paper to another. . . .

*Medeco Security Locks, Inc. v. Swiderek,* 680 F.2d 37, 38 (7th Cir.1981). Having failed to provide any testimony of witnesses, it is concluded U.S. Steel has not carried its burden for preliminary injunction purposes with respect to its position that the language of paragraph 5.1 precludes Phillips from adding terms and conditions to the license offers.

### d. Reasonableness of the Time for U.S. Steel to Accept the Phillips Offer

■ U.S. Steel also contends that pursuant to the Settlement Agreement, Phillips must hold its license offer open for more than ninety days. Paragraph 5.1 of the Settlement Agreement does not contain any time period in which the offer to license is to remain outstanding. As a consequence, it is implied that the offer is to remain open

---

merger obtains all property and rights of any constituent corporation to the merger.

6. For the full text of paragraph 5.1, *see supra* pp. 1–2 (emphasis added).

for a reasonable time. The parties agree that what is reasonable depends on the attendant circumstances.

U.S. Steel vigorously contends that investigations of a "normal" patent's background and negotiations for a license routinely extend beyond three months. This period, defendant asserts, would be grossly inadequate in view of the complex record spanning thirty years involved in the Phillips patent. In addition, U.S. Steel notes that a certain license agreement between Montedison and its licensees allows one year for renegotiation of the license in case of termination. (Doc. 11A, Exh. F, Art. X B(3) p. 11). From this U.S. Steel argues that a *fortiori* more time should be allotted for the original license agreement.

The '851 patent evolved out of an interference proceeding initiated in 1958 and concluded in 1971. While detailed elsewhere, *Standard Oil Company (Indiana) v. Montedison S.p.A.,* 494 F.Supp. 370, 374–75 (D.Del.1980), *aff'd,* 664 F.2d 356 (3d Cir. 1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982), use of the adjectives, protracted and voluminous, to describe the interference can only be characterized as an understatement. In addition, the trial on the appeal of the award of priority was governed by a 181 page pretrial order, consumed 85 trial days, generated over 14,000 pages of transcript, 4,600 exhibits, 500 pages of legal memoranda and 1,800 pages of post-trial briefing. Following an unsuccessful appeal there was an additional eighteen months of proceedings in the patent office before the patent issued.

If one were to make a preliminary determination of the reasonableness of the ninety-day period solely on the size of the record, and the necessity for making a thorough, "leave no stone unturned" patent evaluation, one would have to conclude the ninety-day period was unreasonable. However, the size of the record is not the only pertinent fact. First, U.S. Steel has had available to it the very thorough trial and appellate court opinions emanating from the review of the award of priority. *Stan-*

*dard Oil Co. (Indiana) v. Montedison S.p.A.,* 494 F.Supp. 370 (D.Del.1980), *aff'd* 664 F.2d 356 (3d Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982). While not addressed to validity, those opinions provide far more than what is usually available in making a patent evaluation. Second, U.S. Steel has been on notice since the appellate court affirmance in October, 1981, that it was far more likely than not that a patent would ultimately issue to Phillips. It therefore had over 2½ years to examine the record. Third, by filing its protest in the patent office in April, 1982 (Doc. 13A, Exh. 3), U.S. Steel has demonstrated both its awareness of what was going on plus a more than passing familiarity with the record. Fourth, there is some evidence that about the time of the negotiation of the Settlement Agreement, Montedison itself considered ninety days a sufficient time period for a licensee to elect whether or not to take a license. (Williams Affidavit, ¶¶ 30–31, Doc. 13A, Exh. 2, and Enclosure C of Exhibit A attached thereto). Fifth, while they might not have had as much time as they would have liked, nine of the other licensees have managed to acquaint themselves with the record sufficiently to have decided to negotiate with Phillips, and in the case of several, to accept the license offers, and none except U.S. Steel and Hercules has asserted that the ninety-day period is unreasonable. Finally, given the litigation background and the uncontested reasonableness of the royalty, the decision to enter into the proffered license agreement is basically a relatively simple business decision where an attorney's opinion as to validity, enforceability and infringement of Phillips' patent is but one factor to be considered. On balance, while certainly not generous, given the totality of circumstances, it cannot be said the ninety-day period is unreasonable so as to warrant the issuance of an injunction.

c. *The Termination Clause*

U.S. Steel next argues that certain other terms, such as the termination

clause,[7] in the offered license are unreasonable. In support of its contention to the contrary, Phillips points out examples of licenses issued and proposed by Montedison which include similar termination clauses. (Doc. 11A, Exh. F; Williams Affidavit, ¶¶ 22, 27–28, 30, 32, Doc. 13A, Exh. 2 and Enclosure D of Exhibit A attached thereto). U.S. Steel counters by indicating other Montedison licenses which do not contain termination clauses. (Doc. 13A, Exh. 5, 6, 7).

This variation in licenses indicates at the very least that this might have been a provision appropriate for negotiation. U.S. Steel admits that it has made no effort to approach plaintiff and attempt to negotiate the terms of the March 15 offer. U.S. Steel explains this inaction by asserting that Phillips never gave it any indication that it was willing to negotiate. It is difficult to understand this failure of communication, particularly in light of the fact that nine of the other proposed licensees have been negotiating with Phillips. In addition, U.S. Steel has not alleged Phillips refused to negotiate; rather it appears that U.S. Steel simply failed to request negotiation. Therefore, U.S. Steel has failed to show the termination clause is unreasonable.

*Conclusion*

In summary, the Court finds for preliminary injunction purposes that Phillips is bound by paragraph 5.1 of the Settlement Agreement and that U.S. Steel has demonstrated it has third-party beneficiary status to assert rights under that paragraph. However, U.S. Steel has failed to show a probability of success on the merits of its contract counterclaims. It has not carried

its burden of demonstrating that the language of paragraph 5.1 precludes Phillips from including additional terms and conditions in its license offer. Furthermore, U.S. Steel has failed to show that the additional terms relating to the ninety-day offer period and the termination clause are unreasonable. It is concluded U.S. Steel has failed to establish the requisite probability of success so as to warrant the grant of preliminary injunctive relief.

*Irreparable Injury*

■ Even if the defendant had established a likelihood of success on the merits, it still would not be entitled to a preliminary injunction because it has failed to demonstrate irreparable injury. In order for the Court to issue a preliminary injunction, the moving party must establish that it will incur a serious harm which cannot be undone even if that party ultimately prevails on the merits. *S.J. Stile Assoc. Ltd. v. Snyder,* 646 F.2d at 525. Moreover, the movant must establish more than the mere possibility of injury; the injury must be a presently existing actual threat. *Id.*

■ U.S. Steel claims that it will be subject to irreparable injury whether it accepts or rejects the license. Each scenario must be examined in order to determine the nature of defendant's alleged irreparable injury. Defendant is correct in asserting that if it signs the license, it will be unable to recoup royalties paid to Phillips *pendente lite,* even if it prevails on the merits. In *In re Cole Patent Litigation,* 558 F.Supp. 937, 961 (D.Del.1983), Judge Stapleton held that a licensee cannot seek recoupment of royalties paid *pendente lite* after successfully attacking the validity of a patent.[8]

---

**7.** The termination clause in the proposed license provides:

> 10.2 In the event of the default or failure by LICENSEE to make payment herein provided when due or to comply with any of the terms, covenants or provisions of this Agreement, LICENSEE shall have sixty (60) days after the giving of written notice by PHILLIPS of such default within which to correct such default. If such default is not corrected within the said sixty (60) day period, PHILLIPS shall have the right, at its option, to cancel and terminate this entire Agreement. PHIL-

> LIPS shall have the right, at its option, to cancel and terminate this Agreement in the event that LICENSEE shall become involved in insolvency, dissolution, bankruptcy or receivership proceedings affecting the operation of its business or in the event that LICENSEE should discontinue its business for any reason.

> Doc. 11A, Exh. D.

**8.** The Court cogently reasoned that when a licensee continues to pay royalties after filing a declaratory judgment action:

The issue then becomes whether the inability to recoup royalties constitutes irreparable injury. In *A.O. Smith v. Federal Trade Commission,* 530 F.2d 515, 527–28 (3d Cir.1976), the Third Circuit Court of Appeals held that the loss of profits or the payment of monetary damages does not necessarily constitute irreparable injury. While the Court of Appeals did not establish a bright line test for determining when such losses would constitute irreparable injury, the Court did state that a party need not demonstrate "a corporate liquidity crisis or significant changes in company operation in order to demonstrate irreparable injury." *Id.* at 527 n. 9a. In order to constitute irreparable injury, lost profits must be special, peculiar or work an onerous hardship. *See Coca-Cola Bottling Co. of Shreveport, Inc. v. The Coca-Cola Co.,* 563 F.Supp. 1122, 1141 (D.Del.1982); *Northern National Gas Co. v. United States Dept. of Energy,* 464 F.Supp. 1145, 1158 (D.Del.1979).

U.S. Steel has failed to establish irreparable injury under the standard set forth in *A.O. Smith.* If U.S. Steel signed the license, it would be obligated to pay royalties of 0.175 cent per pound of polypropylene. Assuming U.S. Steel uses 4,000,000 pounds of polypropylene a year as stated in the affidavit of Charles W. Hamilton (Doc. 15), it would be subject to royalties of approximately $700,000 per year. Although this is not an insignificant sum, U.S. Steel has made no attempt to show nor has the Court reason to believe that these payments would be in any way special, peculiar or onerous.

Although under *A.O. Smith* the defendant's inability to recoup royalties paid *pendente lite* would not constitute irreparable injury, U.S. Steel argues that this Court cannot be certain that the Court of Appeals for the Federal Circuit would follow *A.O. Smith,* as the decisions of the Third Circuit Court of Appeals are not binding upon that Court. *See supra* note 4. This assertion is correct since the Supreme Court in *Ohio Oil Co. v. Conway,* 279 U.S. 813, 815, 49 S.Ct. 256, 256–57, 73 L.Ed. 972 (1929), held that the inability of a party to recover taxes paid *pendente lite,* if it prevailed in challenging the tax constituted irreparable injury. Moreover, it cannot be ignored that if the injunction were granted, U.S. Steel would obtain all of the advantages of having entered into a license, *see supra* n. 8, without having actually done so. This can hardly be characterized as an equitable result. As a consequence, it is believed that on balance the Court of Appeals for the Federal Circuit is likely to achieve the result of *A.O. Smith* even if it does not follow its rationale.

More importantly, the defendant can avoid any possible irreparable injury by declining to accept Phillips' license. If U.S. Steel does not accept the license, then any harm that might befall it *pendente lite* can be cured by an adequate remedy should the defendant prevail on its counterclaims. If defendant prevails on its counterclaim for a declaration of its rights under the Settlement Agreement and the Phillips patent is found to be valid, then the defendant will be entitled to a license which includes the Settlement Agreement rate of 0.175 cents per pound and does not include express termination clauses. If the patent is found to be invalid, then defendant will not have lost any royalties paid *pendente lite.* Although the defendant will run the risk that should Phillips prevail on all counts it would have to negotiate for a license from a weak-

---

it "hedges" its bet by continuing the payment of royalties and thereby continues to derive benefits from the license even while attacking the patent.... First, the license assures that the licensee will be able to continue its use of the patented invention during the litigation and, if it loses, thereafter. It has neither of these assurances if it chooses to cease paying and terminate the license. Moreover, continued payment assures the licensee that its use *pendente lite* and thereafter, if he is

unsuccessful, will be at the license royalty rate, thereby providing insurance against the possibility of a higher, court determined "reasonable royalty" or a higher negotiated rate in a new license. Finally, continued payment provides insurance against the possibility of an award of attorneys' fees or treble damages in the event the challenge of the patent is unfruitful.

*In re Cole Patent Litigation,* 558 F.Supp. at 961 [citations omitted].

ened bargaining position, this risk does not constitute irreparable injury.[9]

■ The purpose of a preliminary injunction is to maintain the status quo during the pendency of litigation in order to prevent a moving party from sustaining an irreparable injury should that party ultimately prevail on the merits. *Ohio Oil Co. v. Conway*, 279 U.S. at 815, 49 S.Ct. at 256–57; *National Ass'n of Farmworkers v. Marshall*, 628 F.2d 604, 616 n. 52 (D.C.Cir. 1980); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2947 (1973 & Supp.1983). In the instant case, the defendant will not sustain any harm if it ultimately prevails on the merits. Unlike the party in *Ohio Oil Co.* and in other cases involving a preliminary injunction where the moving party would sustain an irrevocable loss even though it ultimately prevailed, U.S. Steel will sustain no such loss if it prevails.[10] The defendant will be able to obtain all the relief sought in its counterclaims—a rate of 0.175 per pound, a reasonable time to accept the Phillips' offer and the exclusion from the license of express termination clauses for non-payment of royalties or discontinuance of the manufacture of polypropylene without incurring any injury *pendente lite*.[11]

*Conclusion*

In summary, the defendant having failed to establish a likelihood of success on the merits and irreparable injury, its motion for a preliminary injunction will be denied.

An appropriate order will issue.

9. Defendant also asserts that should Phillips prevail on all claims, the possibility exists that U.S. Steel would not be able to obtain a license at all, let alone at a higher rate. This argument is not persuasive. "A preliminary injunction will not issue simply to prevent a mere possibility of injury, even where prospective injury is great." *S.J. Stile Assoc. Ltd. v. Snyder*, 646 F.2d at 525. The possibility that Phillips would sacrifice royalty income and not grant a license to a corporation that manufactures 4,000,000 pounds of polypropylene a year is remote if not nonexistent.

10. The possibility that U.S. Steel will be subject to enhanced damages for willful infringement if it prevails on its counterclaims but loses on the issues of validity and infringement is too remote and unlikely to form a basis for irreparable injury. *See supra* note 9.

11. In view of the Court's holding it is unnecessary to consider the remaining two requirements for a preliminary injunction—interests of third parties and the interests of the public. *See S.J. Stile Assoc. Ltd. v. Snyder*, 646 F.2d at 526 n. 8.